# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) Case No. 5:20-MJ-00345 |
| Apple iPhone X with serial number F17VXBKJJCL8 and IMEI 353045095087407; Scandisk SD data card, seized from a camera bag in Giovanni Dagostino's bedroom; Apple MacBook Laptop, model A1708 with serial number FVFVT1GXHV29 and FCC ID BCGA1708; and X-Box 1 gaming device with serial number 313316452948 and FCC ID C3K1525 | ) ) ) ) ) ) ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | Distribution/Receipt of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jannah R. Holden, Special Agent NCIS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: July 6, 2020

_____
*Judge's signature*

City and state: Riverside, CA

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: Eli Alcaraz, (951) 276-6938/aj

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), were seized on or about April 15, 2020 and are currently maintained in the custody of the San Bernardino Sheriff's Office in San Bernardino, California:

1.    Apple iPhone X with serial number F17VXBKJJCL8 and IMEI 353045095087407;

2.    Scandisk SD data card, seized from a camera bag in Giovanni DAGOSTINO's bedroom;

3.    Apple MacBook Laptop, model A1708 with serial number FVFVT1GXHV29 and FCC ID BCGA1708; and

4.    X-Box 1 gaming device with serial number 313316452948 and FCC ID C3K1525.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (distribution/receipt of child pornography) and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages,

that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls for the period of March 15, 2019 to April 15, 2020;

g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which concern the Subject Offenses;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which concern the Subject Offenses;

      i.   Audio recordings, pictures, video recordings, or still captured images concerning the Subject Offenses;

      j.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

      k.   Calendars and/or date books for the time period of March 15, 2019 through April 15, 2020; and

      l.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      m.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

         i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

         ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

            iii. evidence of the attachment of other devices;

            iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

            v.   evidence of the times the device was used;

            vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

            vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

            viii.    records of or information about
Internet Protocol addresses used by the device;

            ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

     2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II.  <u>SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)</u>

3.   In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

   ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

  e. If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

  f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

  g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

   h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their
support staff for their independent review.

5.    During the execution of this search warrant, law
enforcement is permitted to (1) depress Giovanni DAGOSTINO's
thumb- and/or fingers onto the fingerprint sensor of the SUBJECT
DEVICES (only if the device has such a sensor), and direct which
specific finger(s) and/or thumb(s) shall be depressed; and (2)
hold the device in front of Giovanni DAGOSTINO's face with his
or her eyes open to activate the facial-, iris-, or retina-
recognition feature, in order to gain access to the contents of
any such device.  In depressing a person's thumb or finger onto
a device and in holding a device in front of a person's face,
law enforcement may not use excessive force, as defined in
Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

6.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, JANNAH R. HOLDEN, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application
for a warrant to search four digital devices (collectively, the
"SUBJECT DEVICES"), in the custody of the San Bernardino
Sheriff's Department, in San Bernardino, California, as
described more fully in Attachment A.

2.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 2252A(a)(2) (distribution/receipt of child
pornography) and 2252A(a)(5)(B) (possession of child
pornography) (the "Subject Offenses"), as described more fully
in Attachment B.  Attachments A and B are incorporated herein by
reference.  This application for a search warrant is part of my
investigation into Giovanni Paul DAGOSTINO ("DAGOSTINO")
concerning the Subject Offenses.

3.    The facts set forth in this affidavit are based on my
personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended merely to show that there
is sufficient probable cause for the requested search warrant
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Special Agent with the Naval Criminal Investigative Service ("NCIS") and have been so employed since September 2017.  I am currently assigned to a Family and Sexual Violence position within the NCIS Residence Agency Ventura Office in Port Hueneme, California.  I received a Bachelor of Science degree in Criminal Justice from Old Dominion University in Norfolk, Virginia and a Master of Science degree in Criminology from Boston University in Boston, Massachusetts.  I served in the United States Navy and honorably separated in 2004 at the rank of Petty Officer Second Class.  I thereafter worked for seven years with the Federal Bureau of Investigation in Norfolk, Virginia and Los Angeles, California.  During my time with the FBI, I completed the Staff Operations Specialists Analyst Training Program at the FBI Academy, Quantico, Virginia. During my last year employed with the FBI, I was a member with the Evidence Response Team and received 40 hours of training in the collection of evidence.  Since beginning employment with NCIS, I have also completed the Criminal Investigator Training Program at FLETC in Glynco, Georgia, as well as NCIS's Special Agent Basic Training Program.  I also serve as the NCIS Residence Agency Ventura representative to the Ventura County Cyber Crimes Against Children ("CCAC") working group.  The working group includes members of the Ventura County Sheriff's Department, Homeland Security Investigations, Ventura Police Department, Ventura County Probation Department, Oxnard Police Department, Simi Valley Police Department, and Port Hueneme

Police Department.  As an NCIS Special Agent assigned to the
CCAC working group, I investigate criminal violations concerning
child exploitation and child pornography, including the
production, distribution, receipt, and possession of child
pornography, in violation of 18 U.S.C. §§ 2252 and 2252A.

### III. DEFINITIONS

5.    The following definitions apply to this affidavit and
Attachment B:

a.    "Chat" refers to any kind of text communication
over the Internet that is transmitted in real-time from sender
to receiver.  Chat messages are often short, to enable the
participants to respond quickly, and in a format that resembles
an oral conversation.  These characteristics distinguish
chatting from other text-based online communications such as
posting to Internet forums and sending email.

b.    "Child erotica" means materials or items that are
sexually arousing to persons having a sexual interest in minors,
but that are not necessarily obscene or do not necessarily
depict minors in sexually explicit poses or positions.

c.    "Child pornography" is defined in 18 U.S.C.
§ 2256(8) as any visual depiction of sexually explicit conduct
where (a) the production of the visual depiction involved the
use of a minor engaged in sexually explicit conduct, (b) the
visual depiction is a digital image, computer image, or
computer-generated image that is, or is indistinguishable from,
that of a minor engaged in sexually explicit conduct, or (c) the
visual depiction has been created, adapted, or modified to

3

appear that an identifiable minor is engaged in sexually
explicit conduct.

   d. "Computer" is defined in 18 U.S.C. § 1030(e)(1)
as "an electronic, magnetic, optical, electrochemical, or other
high-speed data processing device performing logical or storage
functions and includes any data storage facility or
communications facility directly related to or operating in
conjunction with such device" and includes smartphones, and
mobile phones and devices.

   e. "Computer hardware" consists of all equipment
that can receive, capture, collect, analyze, create, display,
convert, store, conceal, or transmit electronic, magnetic, or
similar computer impulses or data.  Computer hardware includes
any data-processing devices, including central processing units,
internal and peripheral storage devices such as fixed disks,
external hard drives, floppy disk drives and diskettes, and
other memory storage devices; peripheral input/output devices,
including keyboards, printers, video display monitors, and
related communications devices such as cables and connections;
and any devices, mechanisms, or parts that can be used to
restrict access to computer hardware, including physical keys
and locks.

   f. "Computer passwords and data security devices"
consist of information or items designed to restrict access to
or hide computer software, documentation, or data.  Data
security devices may consist of hardware, software, or other
programming code.  A password, which is a personalized string of

alphanumeric characters, usually operates as what might be termed a digital key to "unlock" data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer or other digital device to access the Internet. Every computer connected to the Internet is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. IP addresses can be "dynamic," meaning that the Internet Service Provider, as defined below, assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an Internet Service Provider assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. From my training and experience, I know that any computer that accesses the Internet must do so through an Internet Service Provider. The Internet Service Provider identifies the computer during the connection session by assigning it an IP address. This number is typically attached to all messages that come to and go from the computer.

h.    "Internet Service Providers" ("ISPs") are commercial organizations that are in business to provide individuals and businesses with access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment. Most ISPs control a range of IP addresses.

i.    "Minor" is defined in 18 U.S.C. § 2256(1) as any person under the age of eighteen.

j.    "Mobile applications" are small, specialized programs, downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading books, or playing games.

k.    "Records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l.    "Remote Computing Service" are defined in 18 U.S.C. § 2711(2) as the provision to the public of computer storage or processing services by means of an electronic communications system.

6.    "Visual depiction" is defined in 18 U.S.C. § 2256(5) and includes undeveloped film and videotape, data stored on computer disc or other electronic means, which is capable of conversion into a visual image, and data that is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

6

## IV. BACKGROUND ON CYBERTIPS OBTAINED BY THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN

7.     The National Center for Missing and Exploited Children ("NCMEC") was established in 1984 as a private, nonprofit organization.  NCMEC provides services nationwide for families and professionals concerning abducted, endangered, and sexually exploited children.  Under its mission and its congressional authorization, NCMEC operates a CyberTip line, which is essentially a forum for private citizens and businesses to report information concerning the mission of the NCMEC, including the sexual exploitation of children.

8.     Under 18 U.S.C. § 2258A, if an ISP such as Google locates the presence of child pornography in a user's account with Google, a CyberTip Report must be submitted to NCMEC. While ISPs such as Google will report the presence of any child pornography they find to NCMEC, they do not conduct an exhaustive search of, for example, a user's email account or cloud storage.  Instead they typically use some automated method for locating images of suspected child pornography.  This may include the use of automated technologies that compare the hash values of images contained in the user's account to the hash values of known images of child pornography.

9.     When NCMEC receives a CyberTip Report concerning the sexual exploitation of children, NCMEC analysts conduct preliminary research to determine the possible location of the incident, and then forward the information to the appropriate

7

Internet Crimes Against Children task force or the appropriate law enforcement agency for a follow-up investigation.

### V. SUMMARY OF PROBABLE CAUSE

10.  On December 19, 2019, NCMEC released CyberTips ("CT") to law enforcement, which were eventually directed to the Ventura County Sheriff's Department, in particular, Detective Nora Soler.  On January 2, 2020, Detective Soler reached out to me regarding her investigation into CT 60181910 and CT 59703458 along with twenty-three other CTs.  All these CTs were sent to NCMEC by Google.

11.  Per Detective Soler, CT 60181910 contained 16 files that had been uploaded to Google's platform.  CT 60181910 states that Google became aware of the 16 reported files when they were stored on Google's infrastructure, specifically Google Drive. Detective Soler determined the files were child pornography. She learned the subscriber information for the account with Google that is associated with CT 60181910.  The account in question belongs to "Giovanni DAGOSTINO" with email account G.Phizzlee@gmail.com ("ACCOUNT 1"), which uses a recovery email address of Giovannidagostino3@gmail.com ("ACCOUNT 2").

12.  Per Detective Soler, CT 59703458 contained 113 files that had been uploaded to Google's platform.  CT 59703458 states that Google became aware of the 113 reported files when they were stored on Google's infrastructure, specifically Google Drive.  Detective Soler determined the files were child pornography.  She learned the subscriber information for the account with Google that is associated with CT 59703458.  The

account in question belongs to "Gio DAGOSTINO" with email account giovannisailor5@gmail.com ("ACCOUNT 3"), which uses a recovery email address of Giovannidagostino3@gmail.com (ACCOUNT 2).

13.  There are 23 additional CTs that refer back to some combination of ACCOUNTS 1-3.

14.  Through investigation into the IP addresses in the CTs, law enforcement was able to determine that DAGOSTINO is the likely user of ACCOUNTS 1-3 and that as of April 2020, he was living in Victorville, California.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

15.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

16.  Google LLC is an Electronic Communication Service Provider and/or ISP.  Under 42 U.S.C. § 13032, Google is required to report child pornography on its platforms, as soon as it is reasonable, through NCMEC's CT process.  NCMEC is a national clearinghouse that gathers information about missing and exploited children for law enforcement use.  NCMEC forwards information from its CT to law enforcement agencies for investigation and disposition, which it is required to do under congressional mandate.

17.  Members of the Los Angeles Internet Crimes Against Children Task Force (the "LA Task Force") can access NCMEC's virtual private network and download CTs, including videos and images that were reported with a CT and that contain suspected

child pornography.  The Ventura County District Attorney's
Office, San Bernardino Sheriff's Department, and Ventura County
Sheriff's Department are affiliates of the LA Task Force.  The
LA Task Force sends the Ventura County District Attorney's
Office, San Bernardino Sheriff's Department, and Ventura County
Sheriff's Department CTs when the LA Task Force determines that
the conduct underlying a CT likely took place in one of the
corresponding counties.

18.  On December 19, 2019, NCMEC released CTs to law
enforcement, which were eventually directed to the Ventura
County Sheriff's Department, in particular, Detective Nora
Soler, by the LA Task Force.  On January 2, 2020, Detective
Soler reached out to me regarding her investigation into CT
60181910 and CT 59703458 along with twenty-three other CTs.  All
these CTs were sent to NCMEC by Google.

**A.   CT 60181910**

19.  Detective Soler received CT 60181910 from the LA Task
Force.  CT 60181910 contains 16 files that had been uploaded to
Google Drive with the first access on approximately April 27,
2019.  Detective Soler determined the images were child
pornography.  That CT concerned the Google account for "Giovanni
DAGOSTINO," with associated screenname "Giovanni DAGOSTINO,"
with email G.Phizzlee@gmail.com (ACCOUNT 1), and with a recovery
email address of Giovannidagostino3@gmail.com (ACCOUNT 2).  The
phone number used during the creation of the Google user account
is (773) 524-0688 ("DAGOSTINO's Phone").

20.   I reviewed the 16 files accompanying CT 60181910 and they generally show prepubescent girls orally copulating adult men and mature penises being used to sodomize infant girls.

21.   For example, one of the files accompanying CT 60181910 is named Google-CT-RPT-c26e0c6e1ea5c57c8125e5cb1b16b63a-2017-06-2019.03.43.jpg.  That image is of 16 thumbnail images, which appear to be screenshots of a video that were then put together into a collage that became the subject file.  The thumbnail images show a young female child, approximately 5-7 years old, on what appears to be a bed.  She is initially dressed until the third thumbnail on the top row, where she is then naked from the waist down and her vagina is visible.  Review of the subsequent thumbnail images confirms that she lacks any pubic hair development.  The first thumbnail in the left hand side of the second row shows an unknown adult man holding his erect penis. In later thumbnails, there appears to be a flashlight illuminating the young girl's genitals, while the unknown adult man attempts to penetrate the child's genitals.  The third thumbnail in the third row shows the adult man inserting his penis into the child.  The last row of thumbnails also shows the adult man inserting his penis into the child.  The final thumbnails appear to show a thick white, milky substance on her abdomen.  That substance appears consistent with semen.

22.   As part of the CT to NCMEC, Google captured the IP addresses used by the "Giovanni DAGOSTINO" account user to log into the user profile when the suspected child pornography was accessed.  Some of those IP addresses were:

      a.    2600:6c51:637f:faa0:cc8:74a7:22b7:fac2,

      b.    2600:6c51:637f:faa0:7ca9:dc7d:4fc1:f482,

      c.    2600:6c51:637f:faa0:ddd2:4edc:1820:cd03, and

      d.    2605:e000:1419:2293:694f:aae8:80db:e190.

23. Detective Soler used law enforcement databases to determine these IP addresses were issued by Charter Communications.  Charter Communications internet is commonly known to subscribers as Spectrum.  Of these four IP addresses, the following returned to a latitude and longitude in the city of Hesperia, which is within San Bernardino County:

      a.    2600:6c51:637f:faa0:cc8:74a7:22b7:fac2,

      b.    2600:6c51:637f:faa0:7ca9:dc7d:4fc1:f482, and

      c.    2600:6c51:637f:faa0:ddd2:4edc:1820:cd03.

24. The following IP address returned to a latitude and longitude in the city of Camarillo, which is within Ventura County: 2605:e000:1419:2293:694f:aae8:80db:e190.

25. Based on my training and experience, I believe that the IP addresses are most likely dynamic, because it is more cost effective for the Internet Service Provider.  In other words, the IP address used when the user of the "Giovanni DAGOSTINO" account logs on will likely change if the user reboots the router.

26. Based on the information Detective Soler received from the CT, she contacted FBI Special Agent Nathaniel Hines and requested his assistance in the investigation.  Agent Hines authored an administration subpoena requesting that Charter

Communications (Spectrum) provide the customer/subscriber information for some IP addresses listed in the CT.

27.   The name, address, and phone number of the Charter Communications (Spectrum) subscriber associated with the four IP addresses listed above are either Juan Barajas with address 18315 Par Lane, Victorville, California 92395 (the "Victorville Address") with phone number (562) 842-7415, or Giovanni DAGOSTINO with address 294 Calle La Granda, Unit C, Camarillo, California 93010 (the "Camarillo Address") with phone number (773) 524-0688 (DAGOSTINO's Phone).  The first three IP addresses listed above (2600:6c51:637f:faa0:cc8:74a7:22b7:fac2, 2600:6c51:637f:faa0:7ca9:dc7d:4fc1:f482, and 2600:6c51:637f:faa0:ddd2:4edc:1820:cd03) returned to the Victorville Address.[1]  The fourth IP address listed above (2605:e000:1419:2293:694f:aae8:80db:e190) returned to the Camarillo Address.

**B.   CT 59703458**

28.   Detective Soler received CT 59703458 from the LA Task Force.  CT 59703458 contains 113 files that had been uploaded to Google Drive with the first access on approximately July 31, 2019.  Detective Soler determined the images were child pornography.  That CT concerns the Google account for "Gio DAGOSTINO," with associated screenname "Gio DAGOSTINO," with email giovannisailor5@gmail.com (ACCOUNT 3), and with a recovery email address of Giovannidagostino3@gmail.com (ACCOUNT 2).  The

---

[1] Earlier in this affidavit, the coordinates for this IP address were said to come from Hesperia, at least according to the CT. Hesperia is a neighboring city to Victorville.

phone number used during the creation of the Google user account is (773) 524-0688 (DAGOSTINO's Phone).

29.  I reviewed the 113 files accompanying CT 59703458 and they generally show prepubescent girls orally copulating adult men and mature penises entering the vagina and/or anus of prepubescent girls.

30.  For example, three of the files accompanying CT 59703458 are named sofia-003.jpg, sofia-006.jpg, and sofia-039.jpg.  They appear to be a series of three images depicting the same prepubescent female child.

a.   In image sofia-003.jpg, the female child is completely naked with her vaginal area visible. She appears to be approximately 4-6 years old based on the apparent size of her body compared to her surroundings, the lack of muscle development or definition, the lack of discoloration of her genitals, lack of pubic hair development, and the lack of breast development.  In the image the child is holding up one of her lets and her vagina is visible.

b.   In image sofia-006.jpg, the same female child is clothed, on her knees, and has her mouth open. There is a thick white, milky substance on her lips and mouth that appears consistent with semen.  An adult left foot (presumably male) is seen in the lower left corner of the image and the flooring is also consistent with sofia-003.jpg.

c.   In image sofia-039.jpg, the same female child is seen from a wider angle than in sofia-006.jpg.  She is clothed, on her knees, and has the same fluid on her mouth, which appears

14

consistent with semen.  Two adult feet are seen at the bottom of
the image and surroundings, flooring, and child are consistent
with sofia-003.jpg and sofia-006.jpg.

31.  As part of the CT to NCMEC, Google captured the IP
addresses used by the "Gio DAGOSTINO" account user to log into
the user profile when the suspected child pornography was
accessed.  Some of those IP addresses were:

    a.  2600:6c51:637f:faa0:b02e:b005:54fd:429f,

    b.  2600:6c51:637f:faa0:6c8b:641a:a228:b503, and

    c.  2600:6c51:607f:ca15:295a:71ff:9e5b:5824.

32.  Detective Solder used law enforcement databases to
determine these IP addresses were issued by Charter
Communications (Spectrum).  Further, the following IP address
from the CT returned to a latitude and longitude in the city of
Camarillo, which is within Ventura County:
2605:e000:1419:a33:dc33:7c3a:df03:29b1.

33.  Based on my training and experience, I believe that
the IP addresses are most likely dynamic, because it is more
cost effective for the ISP.  In other words, the IP address used
when the user of the "Gio DAGOSTINO" account logs on will change
if the user reboots the router.

34.  Based on the information Detective Soler received from
the CTs, she contacted Agent Nathaniel Hines and requested his
assistance in the investigation.  Agent Hines authored an
administration subpoena requesting that Charter Communications
(Spectrum) provide the customer/subscriber information for some
IP addresses listed in the CT.

35.   The name, address, and phone number of the Charter Communications (Spectrum) subscriber associated with at least some of the IP addresses in the administrative subpoena are either Juan Barajas at the Victorville Address with phone number (562) 842-7415, or Amanda Dagostino at the Camarillo Address with phone number (773) 524-0688 (DAGOSTINO's Phone).  For example, IP address 2600:6c51:607f:ca15:295a:71ff:9e5b:5824 returned to the Victorville Address and 2605:e000:1419:a33:dc33:7c3a:df03:29b1 returned to the Camarillo Address.

**C.    25 Total CTs Were Referred to Detective Soler**

36.   As part of this investigation, Detective Soler also received 23 additional CTs.  The CTs refer to some combination of ACCOUNTS 1-3.

37.   The following CTs are associated with giovannisailor5@gmail.com (ACCOUNT 3) and further list Giovannidagostino3@gmail.com (ACCOUNT 2) along with (773) 524-0688 (DAGOSTINO's Phone) on each tip.

> a.   59856187
>
> b.   59703458 (described above)
>
> c.   59863920
>
> d.   60280854
>
> e.   60421755
>
> f.   60294032
>
> g.   60415827
>
> h.   60275996
>
> i.   60286762

j.   60428522

k.   60234219

l.   60404517

38.   The following CTs are associated with
G.Phizzlee@gmail.com (ACCOUNT 1) and further list
Giovannidagostino3@gmail.com (ACCOUNT 2) along with (773) 524-0688 (DAGOSTINO's Phone) on each tip.

a.   60181910 (described above)

b.   60427002

c.   60441586

d.   60559732

e.   60478320

f.   60128158

g.   60195942

h.   61168953

i.   60539333

j.   60495087

k.   60581894

l.   61185086

m.   60964158

**D.   Further Investigation by Detective Soler**

39.   Detective Soler conducted a record check of the name
Giovanni DAGOSTINO and the phone number (773) 524-0688
(DAGOSTINO's Phone).   Detective Soler learned on that August 25,
2019, DAGOSTINO provided DAGOSTINO's Phone to law enforcement as
his contact phone number.   DAGOSTINO provided this number during
an investigation into a traffic collision that was being

conducted by the Ventura County Sheriff's Department.  That
report is identified as RB# 19-133777.  During that
investigation, DAGOSTINO provided a home address of 294 Calle La
Granada, Camarillo, California 93010 (Camarillo Address).
During the traffic collision, DAGOSTINO was driving a 2015 Honda
Civic with California License Plate 7JHJ312.  The Civic was
registered to Juan Alfonso Barajas and Amanda L. Dagostino, with
the address 18315 Par Lane, Victorville, California 92395
(Victorville Address).  As stated above, the Victorville Address
and the Camarillo Address are associated with IP addresses in
CTs.

40.  Detective Soler also learned DAGOSTINO was employed by
the Department of the Navy, at Naval Base Ventura County, Point
Mugu, in Ventura County.  Based on the information provided to
me from Detective Soler, and through my position at NCIS, I
learned DAGOSTINO is an active duty service member of the Navy
and is assigned to Point Mugu Naval Air Station in Ventura
County.

41.  The address DAGOSTINO provided during the traffic
collision investigation (Camarillo Address) is the address
associated with a Camarillo Navy housing lease for DAGOSTINO.
The lease was provided to me by the District Manager for
Camarillo Navy Housing.  According to that lease, DAGOSTINO
began residing at the Camarillo Address on May 22, 2019 until he
vacated it on December 13, 2019.  When he vacated the Camarillo
Address, DAGOSTINO left Camarillo Navy Housing a forwarding

address of "8696 Silverwood Lake P.O. Box, Victorville, CA92395-5129."

42.  Through my position at NCIS, I learned DAGOSTINO's residential address and I shared that with Detective Solder. DAGOSTINO's residential address with the Navy, at least as of April 2020, was 18315 Par Lane, Victorville, California 92395 (Victorville Address).

43.  As explained above, one of the registered owners of the Civic from the August 2019 traffic incident is Amanda L. Dagostino.  According to Navy military records, Amanda L. Dagostino is DAGOSTINO's wife.

**E.  Victorville Investigation**

44.  Based on the information provided by Google, Charter Communications (Spectrum), and the Navy, law enforcement concluded that, at least as of April 2020, DAGOSTINO maintained a primary residence in Victorville.  Detective Soler contacted San Bernardino County Sheriff Detective Brian Arias to assist with the investigation following the conclusion concerning DAGOSTINO's primary residence.

45.  On Wednesday, April 8, 2020, Victorville Sheriff Deputy Vanayes Quezada drove by 18315 Par Lane, Victorville, California 92395 (Victorville Address).  Deputy Quezada saw a white Honda Civic with California License Plate 7JHJ312 parked in front of the drive way of the Victorville Address.  This appeared to be the same Civic driven by DAGOSTINO during the August 2019 traffic incident and that is registered to Juan Alfonso Barajas and Amanda L. Dagostino.  Deputy Quezada also

observed a black Land Rover SUV, parked in the driveway of the
Victorville Address.  The SUV had California License Plate
8LJX839.  A record check of the SUV showed that it is registered
to DAGOSTINO and his wife.

46.  Based on the information gathered by the Ventura
County Sheriff's Department, NCIS, Google, Charter
Communications, and the San Bernardino County Sheriff's
Department, Detective Arias authored a search warrant for 18315
Par Lane, Victorville, California 92395 (Victorville Address).
On April 9, 2020, the Honorable Judge Cara Hudson, Superior
Court Judge for the County of San Bernardino, reviewed and
issued a residential search warrant.

47.  On Wednesday, April 15, 2020, Deputy Arias and I
executed the search warrant at the Victorville Address.

48.  During the search, Deputy Arias seized DAGOSTINO's
(1) Apple iPhone X (his personal cellular telephone) with serial
number F17VXBKJJCL8 and IMEI 353045095087407, (2) Scandisk SD
data card, from a camera bag in DAGOSTINO's bedroom, (3) Apple
MacBook Laptop, model A1708 with serial number FVFVT1GXHV29 and
FCC ID BCGA1708, and (4) X-Box 1 gaming device with serial
number 313316452948 and FCC ID C3K1525 (SUBJECT DEVICES).

49.  When we executed the search warrant, Deputy Arias and
I interviewed Amanda Dagostino, DAGOSTINO's wife, who was
currently residing with her father at the Victorville Address.
Amanda Dagostino confirmed that DAGOSTINO used the email
addresses G.Phizzlee@gmail.com (ACCOUNT 1),
Giovannidagostino3@gmail.com (ACCOUNT 2), and

giovannisailor5@gmail.com (ACCOUNT 3).  Amanda Dagostino also said that her husband told her on an unknown date he had created a new email address:  giovannidagostino3@yahoo.com (ACCOUNT 4). He had told her that he created the account when his G.Phizzlee@gmail.com (ACCOUNT 1), Giovanniodagostino3@gmail.com (ACCOUNT 2), and giovannisailor5@gmail.com (ACCOUNT 3) were allegedly deactivated in late 2019.  According to Amanda Dagostino, the email accounts became deactivate when DAGOSTINO tried to load Microsoft software on his MacBook laptop.

50.  DAGOSTINO was arrested for possession of child pornography.  There are state charges for possession of child pornography pending in the Superior Court for the State of California, County of San Bernardino, but a preliminary hearing has not yet occurred.

**F.   State Search Warrants and Other Investigation**

51.  Deputy Arias searched DAGOSTINO's personal cellular phone under a state search warrant.  The current application is not based on any information found during that search.

52.  Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT DEVICES by other means.

**VII. BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL**

53.  Based on my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I know the following:

a.    Computers and digital technology have
dramatically changed the way in which individuals interested in
child pornography interact with each other.   Computers basically
serve four functions in connection with child pornography:
production, communication, distribution, and storage.

b.    Child pornographers can now transfer printed
photographs into a computer-readable format with a device known
as a scanner.   Furthermore, with the advent of digital cameras
and smartphones with cameras, when the photograph is taken on a
digital camera, it is saved as a digital file that can be
directly transferred to a computer by simply connecting the
camera or smartphone to the computer.   In the last ten years,
the resolution of pictures taken by digital cameras and
smartphones has increased dramatically, meaning that such
pictures have become sharper and crisper.   Photos taken on a
digital camera or smartphone may be stored on a removable memory
card in the camera or smartphone.   These memory cards often
store up to several hundreds of gigabytes of data, which
provides enough space to store a large number of high-resolution
photographs.   Video camcorders, which once recorded video onto
tapes or mini-CDs, now can save video footage in a digital
format directly to a hard drive in the camera.   The video files
can be easily transferred from the camcorder to a computer.
Digital cameras built into smartphones make the photos even
easier to transfer onto other devices.

c.    Modems allow any computer to connect to another
computer using telephone, cable, or wireless connection.

Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.  Child pornography can be transferred via electronic mail or through file transfer protocols to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

       d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  Four-terabyte external and internal hard drives are not uncommon.  Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those

media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them).

   e. Media storage devices can easily be concealed and carried on an individual's person.  For example, it is particularly common for individuals to regularly carry their smart phones on them.  These devices can store thousands of images of child pornography and connect directly to the Internet as well as other cellular devices.

   f. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

   g. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Google, Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

  54. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in,

for example, "bookmarked" files).  Digital information can also
be retained unintentionally such as the traces of the path of an
electronic communication may be automatically stored in many
places (e.g., temporary files or ISP client software, among
others).  In addition to electronic communications, a computer
user's Internet activities generally leave traces or
"footprints" in the web cache and history files of the browser
used.  Such information is often maintained indefinitely until
overwritten by other data.

VIII.   **TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL
         INTEREST IN CHILDREN**

55.  Based on my training and experience, and the training
and experience of other law enforcement officers experienced in
investigating crimes involving the sexual exploitation of
children with whom I have had discussions, I have learned that
there are certain characteristics common to individuals who
distribute and possess child pornography:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children, or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or other visual media, or from literature
describing such activity.

b.   Individuals who have a sexual interest in
children or images of children may collect sexually explicit or
suggestive materials in a variety of media, including

photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography, in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet. Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years. They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure. These collections are typically highly valued.

d. Individuals who have a sexual interest in children or images of children almost always maintain their collections in a safe, secure and private environment, such as

their home.  These collections are often kept close by, usually
at the individual's residence, inside the possessor's vehicle,
or, at times, on their person, to enable the individual to view
the child pornography images, which are valued highly.  Some of
these individuals also have been found to download, view, and
then delete child pornography on their computers or digital
devices on a cyclical and repetitive basis.

        e.    Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials, conceal such
correspondence as they do their sexually explicit material, and
often maintain lists of names, addresses, and telephone numbers
of individuals with whom they have been in contact and who share
the same interests in child pornography.  This was evidenced
here, the target of the investigation communicated with others
through a password-protected meeting room of Application A, and
shared videos of child pornography through displaying or
streaming these videos in the meeting room.

        f.    It is not uncommon for such individuals to use
smartphones for those communications, as these devices allow the
individuals to communicate with each other without being tied to
their desktop or home – the communications can occur anywhere.
Further, smartphones not only easily allow individuals to
communicate with each other via email and text messages and
easily share child pornography images, they also allow
individuals to communicate via apps geared towards private and

secure communications that help them evade detection by law enforcement.

g.   Individuals who have a sexual interest in children or images of children prefer not to be without child pornography for any prolonged period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.   This is one of the reasons that it is not uncommon to find child pornography on smart phones – these phones connect directly to the Internet to allow users to view and download child pornography on their phones, they often have significant storage capacities to allow images and videos to be stored, they are generally password protected and encrypted so the devices are secure, and they allow the user to have access to child pornography 24 hours a day, regardless of whether the individual is at home, at work, in the bathroom, on vacation, et cetera.

i.   Based on my training and experience, as well as conversations with other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I know that computers files, including deleted digital files of child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.  When a person "deletes" a file on

a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Because computer evidence is recoverable after long periods of time, and because there is probable cause to believe that persons at the Victorville Address and the Camarillo Address were once in possession of child pornography and likely obtained it from some as yet unidentified source, there is probable cause to believe that evidence of activity related to the possession and distribution of child pornography, will be found on digital devices recovered from the Victorville Address.

## IX. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

56.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

57.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

30

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  58.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

59.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Giovanni DAGOSTINO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Giovanni DAGOSTINO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    60.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## X. <u>CONCLUSION</u>

61.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
July, 2020.


_____
UNITED STATES MAGISTRATE JUDGE